# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------- x
:
HECTOR, R.[1],                             :                 3:22-CV-01577 (MPS) (RMS)
*Plaintiff,*             :
:
V.                                     :
:
KILOLO KIJAKAZI[2], ACTING       :
COMMISSIONER OF THE SOCIAL   :
SECURITY ADMINISTRATION,     :
*Defendant.*            :
:                        February 23, 2024
:
-------------------------------------------------------- x

## RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM

       This is an administrative appeal following the denial of the plaintiff's application for

disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). It

is brought pursuant to 42 U.S.C. § 405(g).[3]

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) ("the Act"), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] On December 20, 2023, Martin O'Malley was appointed as Commissioner of the Social Security Administration. As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this matter.

[3] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), 423(c)(1). Under the Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929. The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967. If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court. Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner") or, in the alternative, to remand the case for further administrative proceedings. (*See* Doc. No. 18). The Commissioner moves for an order affirming the decision below. (*See* Doc. No. 20).

For the reasons set forth below, the Court respectfully recommends that the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) be **DENIED**, and the Commissioner's Motion to Affirm the Decision of the Commissioner (Doc. No. 20) be **GRANTED**.

## I.    <u>PROCEDURAL HISTORY</u>

On February 8, 2021, the plaintiff filed an application for DIB, with an alleged onset date ("AOD") of September 30, 2014, and a date last insured of September 30, 2014. (*See* Doc. No. 15, Certified Transcript of Administrative Proceedings, dated February 8, 2023 ["Tr"] at 150-151, 163).[4] The plaintiff's application was denied initially on April 8, 2021, and upon reconsideration on May 26, 2021. (Tr. 85, 91). On October 6, 2021, a hearing was held before Administrative Law Judge ("ALJ") Ronald Thomas.[5] (Tr. 33-63). Thereafter, on January 26, 2022, ALJ Thomas issued an unfavorable decision, denying the plaintiff DIB. (Tr. 12-25). On October 13, 2022, the Appeals Council denied the plaintiff's request for review, making ALJ Thomas's decision the final decision of the Commissioner. (Tr. 1-3).

---

[4] It is noted at the outset that the plaintiff's alleged onset date of September 30, 2014, directly coincides with the plaintiff's date last insured. "To be entitled to benefits, [the] plaintiff must demonstrate that he was disabled prior to the expiration of his insured status, *i.e.*, as of his date last insured ('DLI')." *Ronald B. v. Comm'r of Soc. Sec.*, No. 21-CV-381 (SALM), 2022 WL 1210741, at *4 (D. Conn. Apr. 25, 2022) (emphasis in original) (citations omitted). As such, determining whether the plaintiff was disabled prior to his DLI requires a finding that the plaintiff was disabled on September 30, 2014. Stated differently, the relevant period of disability is one day.

[5] The hearing was conducted telephonically due to the extraordinary circumstance presented by the COVID-19 pandemic. (Tr. 15).

On December 12, 2022, the plaintiff filed the present action. (Doc. No. 1). Absent the consent of the parties, on January 9, 2023, the case was referred to the undersigned for all purposes, including the issuance of a recommended ruling. (*See* Doc. No. 14). On March 8, 2023, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 18), along with a supporting memorandum (Doc. No. 18-1). Thereafter, on March 17, 2023, the Commissioner filed a Motion to Affirm (Doc. No. 20), along with a supporting memorandum and separate statement of material facts (Doc. No. 20-1, 20-2). The plaintiff did not file a reply.

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts. (*See* Doc. Nos. 18-1; 20-2). The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

At the time of the hearing in October 2021, the plaintiff was 63 years old, he had two adult children, and he lived alone. (Tr. 36-37). The plaintiff completed some college and had a driver's license as well as a vehicle. (Tr. 37).

The plaintiff had previously owned a karate dojo, but the business closed due to the COVID-19 pandemic. (Tr. at 39). The plaintiff expressed that he was hoping to be able to reopen the business. (*Id.*). When asked what was keeping him from currently working full time, the plaintiff stated that he suffered from hearing loss, back pain which stopped him from being able to be seated for extended periods of time, and gout on his feet which made it so that he could not stand for long periods of time. (*Id.*). The plaintiff was working four hours per week teaching karate at the Andrew J. School at the time of the hearing. (Tr. 38). In order to do so, however, the plaintiff relied on his grandson, a black belt in karate, to demonstrate the moves to the class. (Tr. 49).

At the time of the alleged onset of disability in 2014, the plaintiff stated that he had difficulty hearing and understanding people. (Tr. 52). In the three years leading up to the date of onset, the plaintiff also suffered from neck, ankle, and shoulder pain. (*Id.*). As a result of this pain, the plaintiff already needed to have students who were black belts in karate demonstrate the moves for him in his classes. (*Id.*).

As for tasks of daily living at the time of the alleged onset of disability in 2014, the plaintiff was able to do some household tasks including laundry and cooking but did so in the presence of his significant other in case he needed assistance. (Tr. 53). He was only able to lift approximately ten to fifteen pounds, could only stand in one place for fifteen to twenty minutes before needing to walk or sit, and was only able to walk for approximately five to ten minutes before needing to sit. (Tr. 54).

The plaintiff testified that, more recently, he was being seen by a doctor in Bridgeport for his hearing but stated that he could not remember the name of the provider or the office. (Tr. 40). The plaintiff was last seen by this provider a few months before the October 2021 hearing. (*Id.*). The plaintiff stated that, although he wore hearing aids, he still could not hear well enough and needed to have someone with him at all times to help him understand others. (*Id.*).

The plaintiff also saw a chiropractor for his back pain, which he experienced all day long. (Tr. 41). He said that, if he turned the wrong way, he would drop to his knees. (*Id.*). He refrained from lifting anything out of fear that his back would give out and he would fall on his face. (Tr. 42). This included refraining from carrying his grandchild. (*Id.*). The last time the plaintiff had seen the chiropractor was a few months before the hearing. (Tr. 41). The plaintiff did not see any other providers for his back pain and refused to have surgery out of fear of losing whatever mobility he had left. (*Id.*).

The plaintiff was also being treated for gout that would frequently flare up in the heels of his feet. (Tr. 42). Although the gout was able to be controlled with medication, the medication contributed to on-going issues with his liver, and he was taken off it. (*Id.*).

As to the issues with the plaintiff's liver, he testified that he was being treated by a physician at Yale and was going through the process of being placed on a list for a liver transplant. (Tr. 44). The cirrhosis of the plaintiff's liver was caused by fatty liver (*Id.*) When asked if he had any problems with alcohol the plaintiff testified that he used to consume alcohol, but he reportedly had not had a "hard drop of liquor" in over 30 years. (*Id.*).

The plaintiff was also being treated by an ophthalmologist for a hepatitis infection in his eye that affected his vision. (Tr. 45). Despite being prescribed medication, however, the plaintiff reported that he was still unable to see at night. (*Id.*).

The plaintiff was additionally being treated for issues with his left shoulder. (Tr. 46). The plaintiff was last seen at an Orthopedist's office in Bridgeport the year prior to the hearing. (*Id.*). At this time, he was treated with cortisone, which he reported only made the condition worse. (Tr. 46-47). The plaintiff reported that he had previously been told that the damage to the shoulder was irreparable. (Tr. 46).

Lastly, the plaintiff testified that he had been previously diagnosed with pancreatitis. (Tr. 47). At the time of the hearing, he had three large cysts on his pancreas. (*Id.*).

By the time of the hearing in October 2021, the plaintiff could still wash and dress himself, but could not cook, do laundry, or go grocery shopping. (Tr. 48). He was unable to travel since the alleged date of onset and no longer traveled beyond New Haven where he went for his doctor's appointments. (Tr. 49). The plaintiff no longer participated in any sports and passed the time by sitting in his recliner with a heating pad on and reading. (*Id.*). The plaintiff was not computer

literate. (*Id.*). The plaintiff's significant other was responsible for all the plaintiff's finances, and he reported that he was unaware of how much income he was making from his part time work at the Andrew J. School. (Tr. 50).

### B.    The Vocational Expert's Hearing Testimony

VE Fazzolari also testified at the plaintiff's hearing in October 2021. He explained the plaintiff's RFC using various hypothetical scenarios. (Tr. 55-61).

The ALJ presented VE Fazzolari with a hypothetical involving an individual of the plaintiff's age, education, and with no past relevant work who was unable to lift anything at one time, unable to walk more than ten minutes, and unable to stand for more than twenty minutes at a time and would likely be absent more than four days per month on average. (Tr. 56). VE Fazzolari testified that such an individual would be unemployable. (*Id.*).

The ALJ then presented VE Fazzolari with a separate, unrelated hypothetical, involving an individual of the plaintiff's age, education, and with no past relevant work, who was limited to light exertion, and was further limited to avoiding hazards such as heights, vibration, and dangerous machinery, but was okay for personal daytime driving; was limited to occasional twisting and squatting, bending and balancing, kneeling, crawling, and climbing (except for climbing of ropes, scaffolds, and ladders); was limited to activity with no left or right foot controls; who needed an environment free from very loud noise; and who was limited to occasional overhead reaching with the left non-master arm. (Tr. 56-57). VE Fazzolari testified that such an individual could perform the work of an assembler, a cleaner, and a price marker. (Tr. 57-58).[6] An assembler is a light exertion job, and at the time of the hearing, there were approximately 160,000

---

[6] The VE testified that he was reducing the number of jobs by one half to accommodate the hypothetical's limitation to overhead reaching of the dominant extremity. (Tr. 57). The VE did this based on his professional experience as to reaching restrictions because the DOT did not distinguish between left and right reaching, upper non-dominant reaching, and directional reaching. (Tr. 59).

jobs nationally. (Tr. 57). A cleaner is also a light exertional level job, and at the time of the hearing, there were approximately 110,000 jobs nationally. (Tr. 58). Lastly, a price marker is a light exertional level job, and at the time of the hearing, there were approximately 65,000 jobs nationally. (*Id.*).

The ALJ then presented a third, unrelated hypothetical involving an individual of the plaintiff's age, education, with no relevant work, who was limited to the medium exertional level and with the same restrictions as the second hypothetical. (Tr. 58). VE Fazzolari testified that such an individual could perform the work of a cleaner, a food service worker, and a hand launderer. (Tr. 59). A cleaner is a medium exertional level job, and at the time of the hearing, there were approximately 27,000 jobs nationally. (*Id.*). A food service worker is also a medium exertional level job, and at the time of the hearing, there were approximately 22,000 jobs nationally. (*Id.*). A hand launderer is also a medium exertional level job, and at the time of the hearing, there were approximately 10,000 jobs nationally. (*Id.*). VE Fazzolari also explained that, if the person was limited to occasional reaching in any direction with the dominant arm, these three jobs would no longer be appropriate, and he would be unable to classify any other positions. (Tr. 60).

Further VE Fazzolari testified that if a worker at the medium exertional level needed to take breaks between standing or walking or needed a 50/50 stand/sit option, the hypothetical individual would be unable to perform the previously identified jobs. (Tr. 61).

### C.    Objective Medical Evidence[7]

In order to ensure that all bases for disability were considered, the ALJ reviewed medical evidence from the indication of first treatment in March 2011, through December 2017, a period extending over three years beyond the plaintiff's date last insured. (Tr. 20).

On March 4, 2011, the plaintiff was seen by Dr. Jeffrey Montano, for a bone protrusion on his right hand and right knee. (Tr. 3347). The plaintiff reported that both had been present over the past year but had grown worse in the preceding month. (*Id.*). On March 17, 2011, the plaintiff had an x-ray taken of his right hand which showed osteoarthritic changes at the first carpal metacarpal joint. (Tr. 3238). On March 25, 2011, the plaintiff again reported to Dr. Montano with complaints of right arm pain which had been occurring for two weeks. (Tr. 3344). The plaintiff reported no relief with NSAID pain relievers. (*Id.*).

On April 7, 2011, the plaintiff had a CT scan of his abdomen and pelvis which showed diverticulosis without the evidence of diverticulitis, and pancreatic calcifications and subtle fat stranding around the head of the pancreas, as well as wall thickening of the second and third portions of the duodenum, which is in close relation to the pancreas. (Tr. 3240).

On July 8, 2011, the plaintiff was seen in the emergency room because of bleeding from his left ear. (Tr. 3250). The plaintiff noted decreased hearing in the left ear. (Tr. 3250). It was assessed that there had likely been a rupture in the plaintiff's ear on account of the blood. (Tr. 3252). The plaintiff did report that he had gone swimming in the Long Island Sound on the Wednesday prior to presenting to the emergency room. (Tr. 3250).

---

[7] The following recitation of the objective medical evidence is based upon the plaintiff's overview of his relevant medical records (*see* Doc. No. 18 at 5-10), the Commissioner's statement of material facts (*See* Doc. No. 20-2), the ALJ's decision, and the Court's own review of the administrative record.

On November 8, 2011, the plaintiff was treated for epigastric pain and pancreatitis, at which time he was instructed to stop drinking alcohol. (Tr. 3559).

On April 23, 2012, the plaintiff was seen by Dr. Montano for complaints of left leg pain for the past six months, in his inner left thigh. (Tr. 3341). He was unable to raise his left leg with the pain in the area, and the notes indicated that the plaintiff was a competitive kickboxer. (*Id.*). The plaintiff also expressed concern about gout in his right foot (*Id.*). Dr. Montano referred the plaintiff for physical therapy. (Tr. 3343).

On June 29, 2012, the plaintiff was seen in the emergency room for a potential sprained ankle. (Tr. 3241). The plaintiff reported experiencing pain, itching, and swelling. (*Id.*). He was assessed as having cellulitis of the leg and a skin rash. (Tr. 3244).

On October 12, 2012, the plaintiff had a follow-up appointment with Dr. Montano for a pulled muscle in his groin area. (Tr. 3337). It was noted in the record that the plaintiff was a competitive kickboxer and that he believed he needed additional physical therapy. (*Id.*). It was also determined that the plaintiff should be referred for a hearing test due to hearing loss. (*Id.*).

On November 5, 2012, the plaintiff presented to Dr. Montano with complaints of back pain, shoulder pain, and neck pain caused by a car accident that had happened the previous day. (Tr. 3334). The plaintiff was seen again by Dr. Montano on November 23, 2012, for neck pain and headaches related to the accident. (Tr. 3331).

An x-ray of the plaintiff's back was performed on November 26, 2012. (Tr. 3292). The x-ray showed degenerative changes to the plaintiff's cervical spine, including a small anterior cervical osteophyte at C2-C3, C3-C4, and C4-C5 and prominent anterior osteophytes at C5-C6. (*Id.*).

On December 7, 2012, the plaintiff was seen by Dr. Montano for lower back pain. (Tr. 3328). The plaintiff reported having experienced the pain since the November 4, 2012, car accident. (*Id.*).

On May 16, 2013, the plaintiff was seen by Luis Rojas, APRN, for bilateral heel pain and swelling which he reported had been constant for the previous three days. (Tr. 3322). His ankle was tender when palpated, and he was assessed with gout and limb pain. (Tr. 3325).

On June 6, 2013, the plaintiff was seen by Dr. Montano, presenting with five months of occasional abdominal pain, and admitted to consuming more alcohol recently. (Tr. 3319). On June 19, 2013, the plaintiff was seen again by Dr. Montano and was diagnosed as having had steatorrhea with mild epigastric pain. (Tr. 3316). The record reflects that his symptoms subsided with the cessation of alcohol. (*Id.*).

On September 18, 2013, the plaintiff was treated again for epigastric pain. (Tr. 3312). The pain began after a karate competition and had lasted for two days. (*Id.*). Zantac was not effective at addressing his symptoms. (*Id.*). The plaintiff was assessed as having costochondritis (Tietze's syndrome) and chest pain. (Tr. 3314).

On November 11, 2013, Mr. Rodriguez was seen by Dr. Montano for left shoulder pain. (Tr. 1742). The plaintiff reported that, any time he lifted his hand, he got a sharp pain in his shoulder, and that, if he was holding something, he had to drop it. (*Id.*). The plaintiff was assessed as having arthralgia of the shoulder region. (Tr. 1744).

The plaintiff was seen by Esher Mervil, APRN on January 24, 2014, complaining of pain in his right ankle lasting two weeks. (Tr. 288). At this time, the plaintiff stated that he had a history of gout, and that his symptoms had worsened since running out of medication. (*Id.*).

Records from a visit with Dr. Montano on January 31, 2014, indicated that the plaintiff had been experiencing gout affecting the right ankle, but that the condition improved after four days on indomethacin. (Tr. 284).

On July 17, 2014, the plaintiff was seen by Dr. Montano complaining of left hip pain. (Tr. 280). The plaintiff had been experiencing such pain for three to four weeks at the time of this visit. (*Id.*).

On July 31, 2014, the plaintiff was seen by Dr. Montano requesting medication for gout. (Tr. 279). Upon presentation, the plaintiff was walking with a limp which he thought was caused by the fact that he had eaten shellfish. (*Id.*). Dr. Montano prescribed the plaintiff indomethacin. (*Id.*).

On October 29, 2014, the plaintiff was seen by Dr. Montano for intermittent right leg pain. (Tr. 276). The plaintiff reported taking no over the counter medications for the pain. (*Id.*). The records from this visit reflect that the plaintiff experienced gout attacks three to four times per year. (*Id.*).

On December 15, 2014, the plaintiff presented to Dr. Karana Pierre with bilateral foot and knee pain. (Tr. 272). At this time the plaintiff stated that he had more pain in his right foot and that, because of the pain, he was now limping when he walked. (*Id.*). The plaintiff also reported experiencing a gout attack two months prior. (*Id.*). As to the origination of the pain, the plaintiff denied experiencing any trauma, but reported to Dr. Pierre that he had been a shotakan/goju rue teacher for the prior four years. (*Id.*).

On January 16, 2015, the plaintiff was treated by Dr. Montano as part of routine follow-up. (Tr. 264). During this visit, the plaintiff reported pain in his right and left hips which occurred when he slept. (*Id.*). The plaintiff was assessed with bursitis of the hip. (Tr. 265). Also on January

16, 2015, the plaintiff was seen for follow-up care by Dr. Pierre regarding his foot pain. (*Id.*). At this time, the plaintiff reported feeling much better and had no other concerns. (*Id.*). At this time, the plaintiff was taking medication for gout. (Tr. 272).

The plaintiff presented to Dr. Pierre on March 16, 2015, for a podiatry follow-up, at which time he reported that the pain in his ankle was gone. (Tr. 259). He stated that he had been eating a lot of sea food and was attending a lot of social engagements which he claimed had contributed to the pain. (*Id.*). The medical records do reflect, however, that the plaintiff still had abnormal motion in the right ankle, some pain in the left ankle, and some swelling of the left foot. (Tr. 260). Microfilament wire tests also showed decreased sensation in the left and right foot. (Tr. 261).

In December 2015, the plaintiff was referred to physical therapy for worsening right shoulder pain. (Tr. 383). At this time, the plaintiff reported that he was unable to do planks and that he worked as a karate instructor. (*Id.*). The plaintiff also reported experiencing pain with reaching, swimming, and performing movements in karate including punching and weapon wielding. (Tr. 385). The plaintiff stated as a goal for his physical therapy to return to practicing karate pain free. (*Id.*). A further note from physical therapy on March 2, 2016, indicated that the plaintiff's shoulder hurt but that "he doesn't stop." (Tr. 2563). The plaintiff did state that he was "taking it easy with workouts." (Tr. 2561). Again, on March 21, 2016, the plaintiff reported being sore after competing in a martial arts competition. (Tr. 442). He competed in a martial arts competition again in April 2016, after which he reported that his shoulder was a lot better and that his punching and weapons movements were also improved. (Tr. 2545-2548).

On September 28, 2016, the plaintiff was seen by Dr. Montano, at which time he denied experiencing any muscle aches, joint pain, stiffness, motor disturbance, sensory disturbance, and

gastrointestinal symptoms. (Tr. 494-95). He also showed no swelling of the feet or sensory abnormalities, and his gait and stance were normal. (Tr. 497).

On April 23, 2017, the plaintiff reported to the emergency room with complaints of cramping in his arm, neck, and legs. (Tr. 552). The plaintiff stated that he experienced this pain primarily while working out and that he was working out an average of two-and-a-half hours per day, six days per week. (Tr. 552).

On May 2, 2017, the plaintiff was seen by Dr. Montano and complained of groin and shoulder pain. (Tr. 491). The record also reflects that the plaintiff was a participant in competitive marital arts and trains vigorously. (Id.) The plaintiff was assessed as having muscle strain and was prescribed a muscle relaxer and told to allow his muscles to rest and recover while training. (Tr. 491, 493).

On July 25, 2017, the plaintiff presented to the emergency room for bilateral hand pain after he was doing karate. (Tr. 2530). X-rays were taken of the plaintiff's hand and revealed closed hand fractures for which he was given a splint and prescribed pain medication. (*Id.*). However, in late August 2017, the plaintiff reported that he had reinjured his hand after getting in a "stupid fight" at a gym. (Tr. 2509).

### D.     Medical Opinion Evidence

In assessing the plaintiff's RFC, the ALJ considered the State agency (DSS) assessments of medical consultants Gary Tickey, M.D., and Mark Kuge, M.D. (Tr. 69-72, 76-78).

### 1.     Dr. Gary Tickey, M.D.

Dr. Tickey evaluated the plaintiff's claims that he suffered from loss of hearing, pancreatitis, and liver issues, concluding that there was no medical evidence supporting these allegations prior to September 30, 2014, which was the plaintiff's date last insured. (Tr. 71). He

also noted that the plaintiff experienced bouts of gout but that they were treated medically. (*Id.*). In reaching his conclusion, Dr. Tickey reviewed the medical evidence starting with the plaintiff's hearing loss. (Tr. 69). Dr. Tickey considered a hearing test which took place on March 7, 2019, finding that the plaintiff experienced moderate to severe hearing loss in both ears, and an audio evaluation from July 1, 2020, also finding that the plaintiff had moderate to severe hearing loss. (*Id.*). As to the pancreatitis, Dr. Tickey reviewed an August 3, 2017, record diagnosing the plaintiff with chronic pancreatitis as well as the results of an upper endoscopy performed on March 8, 2021. (Tr. 69-70).

Related to the issues with the plaintiff's liver, Dr. Tickey reviewed the results from an ultrasound report dated September 18, 2015, a report from a colon biopsy dated October 15, 2015, and an appointment record from December 7, 2020, diagnosing the plaintiff with liver disease and recommending that the plaintiff remain on medication and switch to a high fiber diet. (Tr. 70). Dr. Tickey also reviewed multiple records related to the plaintiff's shoulder and foot pain, including a November 11, 2013, treatment record diagnosing the plaintiff with arthralgia of the shoulder region, a January 14, 2014, treatment record diagnosing the plaintiff with a sprained ankle, and records treating the plaintiff for gout on October 29, 2014, December 15, 2014, January 16, 2015, and March 16, 2015. (*Id.*). The treatment record from October 29, 2014, also reflects that the plaintiff suffered from osteoarthritis. (*Id.*). Dr. Tickey further considered a series of appointments addressing pain in the plaintiff's left shoulder from May 30, 2017, July 18, 2017, and August 22, 2017, which reported the plaintiff as having experienced a sharp pain in his left shoulder when lifting, but that the pain was improved after acupuncture. (*Id.*). Dr. Tickey also reviewed available lab work and primary care visits for the period from October 10, 2012, through December 16, 2015. (Tr. 71).

As for functional information, Dr. Tickey observed that, although the plaintiff wore hearing aids, he had no issues communicating over the phone and he was still running his karate dojo and working approximately thirty hours per week. (Tr. 69).

Based on his review of the medical evidence, Dr. Tickey found that the plaintiff had no medically determinable impairments and therefore was not disabled. (Tr. 71-72). As such, Dr. Tickey did not provide an assessment of the plaintiff's RFC. (Tr. 72).

### 2. Dr. Mark Kuge, M.D.

Dr. Mark Kuge similarly reviewed the plaintiff's medical records, assessing the plaintiff's claims for hearing loss, pancreatis, and liver issues. (Tr. 76). As to the plaintiff's hearing loss, Dr. Kuge considered the plaintiffs hearing test from March 7, 2019, showing moderate to severe hearing loss. (*Id.*). Dr. Kuge also noted the audio evaluation dated July 1, 2020, reporting the plaintiff as having moderate to severe haring loss. (*Id.*). As to the plaintiff's allegations of pancreatitis, Dr. Kuge referred to a CT scan from August 3, 2017, showing that the plaintiff had acute pancreatitis. (*Id.*). Dr. Kuge then stated that there was no medical evidence to support any claimed disability in 2014. (*Id.*). As for his functional observations of the plaintiff, Dr. Kuge noted in the assessment that the plaintiff had no hearing issues on the phone. (*Id.*).

Based on his review of the medical evidence, Dr. Kuge similarly found that there was no evidence to support the plaintiffs allegations from the relevant period in 2014 and that the plaintiff had no medically determinable impairments and was not disabled. (Tr. 76-77). Dr. Kuge therefore did not provide an assessment of the plaintiff's RFC. (Tr. 77).

## III.    THE ALJ'S DECISION

In a decision dated January 31, 2022, ALJ Thomas found that the plaintiff was not disabled. (*See* Tr. 15-25).

Following the five-step evaluation process,[8] the ALJ found that the plaintiff met the insured status requirements through September 30, 2014, and that he had not engaged in substantial gainful activity during the period from his alleged onset date of September 30, 2014, through his date last insured of September 30, 2014. (Tr. 18). The period of claimed disability was only one day, September 30, 2014, as this was both the alleged onset date and the date last insured. The ALJ did note that the plaintiff was involved in teaching and competing in martial arts during this period but found that anecdotal self-reports of this activity were insufficient to support a finding of substantial gainful activity. (*Id.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: hearing loss and arthralgias. (*Id.*, citing 20 C.F.R. § 404.1520(c)). The ALJ considered, but found to be non-severe, the following other impairments: gout, pancreatitis, plantar fasciitis, hand fractures, shoulder impingement, and cardiomegaly. (*Id.*).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

---

[8] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that he cannot perform his former work, then the burden shifts to the Commissioner to show at Step Five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows that she cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

The ALJ determined that the plaintiff had the RFC to perform medium work, as defined in 20 CFR 404.1567(c), except that he should avoid hazards such as heights, vibration, and dangerous machinery, but was able to drive a personal automobile; could engage in occasional bending, balancing twisting, squatting, kneeling, and crawling; could occasionally climb but could not climb ropes scaffolds or ladders; should not operate left or right foot controls due to gout; should work in an environment free from very loud noise; and could engage in occasional overhead reaching with the left master arm. (Tr. 19).

At step four, the ALJ found that the plaintiff had no past relevant work, stating that, although the record contained anecdotal self-reports that the plaintiff taught karate, there were no corresponding earnings rising to the level of substantial gainful employment. (*Id*. at 23).

Finally, at step five, the ALJ considered VE Fazzolari's testimony in conjunction with the plaintiff's RFC, age, education, and work experience, and concluded that the plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 23-24). Accordingly, the ALJ concluded that the plaintiff had not been under a disability between September 30, 2014, the alleged onset date, through September 30, 2014, the date last insured. (*Id.* at 24, citing 20 C.F.R. § 404.1520(g)).

## IV.    STANDARD OF REVIEW

An individual who is disabled is entitled to receive benefits under the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), 1381a. To be considered disabled and entitled to DIB under the Social Security Act, a claimant must demonstrate that he is unable to work "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or is expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such an impairment must be "of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.20(c) (requiring that an impairment or combination thereof significantly limit[] . . . physical or mental ability to do basic work activities" to be considered "severe").

When the ALJ determines that a claimant is ineligible for benefits, and the Commissioner affirms the decision, the claimant may seek judicial review by the district court. *See* 42 U.S.C. § 405(g). When reviewing the ALJ's decision, the district court "is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The district court may not, in the process of reviewing a denial of benefits, make a *de novo* disability decision. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). As such, the district court's review is limited to determining whether the Commissioner applied the correct legal standards, and whether there is substantial evidence in the record to support the Commissioner's decision. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Absent legal error, the district court may not set aside the ALJs decision if supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(citation omitted); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would have to conclude otherwise." *Brault v.*

*Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations omitted). "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id.* "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V. <u>DISCUSSION</u>

Before addressing the parties' respective arguments, it is important to clarify the relevant period under review. "A claimant, such as the plaintiff here, seeking DIB for a period of disability must both present evidence of his disability <u>and</u> satisfy the 'insured status' requirements of the Act." *Ronald B. v. Comm'r of Soc. Sec.*, No. 21-CV-381 (SALM), 2022 WL 1210741, at *4 (D. Conn. Apr. 25, 2022) (emphasis in original) (citing 42 U.S.C. § 423(c)). As such, "[t]o be entitled to benefits, [the] plaintiff must demonstrate that he was disabled prior to the expiration of his insured status, *i.e.*, as of his date last insured ('DLI')." *Id.* (emphasis in original) (citations omitted). Here, the plaintiff was insured for a short period from July 2014 through September 2014. (Tr. 163). This makes the plaintiff's DLI September 30, 2014. The plaintiff then claims September 30,

2014, as the alleged onset date. The inquiry, therefore, is whether the plaintiff was under a disability on September 30, 2014. The ALJ considered medical evidence from March 2011 through December 2017 to ensure that any possible basis for disability was considered. (Tr. 20). Any medical evidence is probative, however, only to the degree to which it indicates the presence of a condition giving rise to a finding of disability before the plaintiff's DLI on September 30, 2014.

The plaintiff advances several arguments for why the ALJ's decision should be rejected here. First, the plaintiff claims that the ALJ erred in finding that the plaintiff could meet the physical demands of medium exertion work. (Doc. No. 18 at 12-14). The plaintiff also claims that the ALJ was incorrect in his assessment of the plaintiff's capacity based on his work activity and perceived level of activity during this period. (*Id.* at 15-16). In addition, the plaintiff argues that the ALJ's decision must be reversed because he had no medical source opinions on which to formulate the plaintiff's RFC. (*Id.* at 16-17). Had the plaintiff been appropriately classified in the light exertional level, the plaintiff asserts that he would be considered disabled under Grid Rule 202.06. 20 C.F.R. Pt. 404, Subpt. P, App. 2 §202.06. (*Id.* at 19). Lastly, the plaintiff argues that the ALJ failed to accurately consider the plaintiff's hearing loss. (*Id.* at 19-20).

The Commissioner disputes the plaintiff's claims by arguing there is substantial evidence in the record to support the ALJ's finding that the plaintiff could perform a reduced range of medium work and that (1) the ALJ was not required to base the RFC on a medical opinion; (2) the record lacks evidence that the plaintiff had greater exertional limitations; (3) the ALJ reasonably considered evidence of significant martial arts activity in the record; (4) substantial evidence supports the RFC without further limitations due to hearing loss; and (5) the plaintiff has not established that he is entitled to Title II benefits. (*See* Doc. No. 20).

The Court agrees with the Commissioner, and for the reasons set forth herein, respectfully recommends that the plaintiff's motion for an order reversing or remanding the ALJ's decision be **DENIED**, and the Commissioner's motion for an order affirming the decision be **GRANTED**.

### A.    The ALJ's Duty to Develop the Administrative Record

As part of the plaintiff's challenge to the ALJ's RFC determination, the plaintiff asserts that the ALJ erred in formulating the RFC as he had no medical opinion evidence on which to rely. (Doc. No. 18 at 16-17). The plaintiff does not contest the weight assigned to the State agency representative assessments by the ALJ but takes issue with the fact that, without these opinions, the ALJ had no medical opinions on which to base the plaintiff's RFC. (*Id.* at 16). As such, the plaintiff asserts that the ALJ was unable to properly assess the significance of the plaintiff's co-occurring illnesses, including at least two types of arthritis. (*Id*). The Commissioner maintains that the ALJ is not required to base his decision on medical opinion evidence and is under no regulatory obligation to solicit a medical opinion. (Doc. No. 20-1 at 5).

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). It is therefore incumbent upon the ALJ to "investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 111. As such. "[b]efore determining whether the Commissioner's conclusions are supported by substantial evidence," this Court, "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficial purpose of the Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). This includes, as a threshold question, "whether the ALJ has satisfied his or her duty to develop he administrative record." *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 162 (S.D.N.Y. 2022).

The ALJ is under an "affirmative obligation to develop a complete and accurate medical record." *Ida S. v. Comm'r of Soc. Sec.*, No. 21-CV-578 (MPS), 2022 WL 1963646, at * 7 (D. Conn. June 6, 2022) (quoting *Mahmud v. Saul*, No. 19-CV-1666 (TOF), 2020 WL 6866674, at *10 (D. Conn. Nov. 23, 2020)). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n 5 (2d Cir. 1999) (citing *Perez v. Charter*, 77 F.3d 41, 48 (2d Cir. 1996)). "Accordingly, the duty to develop the administrative record is triggered 'only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled.'" *Ronald B. v. Comm'r of Soc. Sec.*, No. 21-CV-381 (SALM), 2022 WL 1210741, at *4 (D. Conn. Apr. 25, 2022) (quoting *Walsh v. Colvin*, No. 13-CV-687 (JAM), 2016 WL 1626817, at *2 (D. Conn. Apr. 25, 2016)). A complete medical history is one that addresses "at least the preceding twelve months of any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B); *see* C.F.R. § 404.1512(b)(1) (clarifying that this twelve month period refers to the twelve months preceding the month in which a claimant files an application, "unless there is a reason to believe that development of an earlier period is necessary").

The ALJ in this case based his findings on seven years of medical records and tests results and had before him the assessments of two State agency physicians. In determining that the plaintiff could perform a reduced range of medium of work, the ALJ also had the benefit of the plaintiff's hearing testimony, including testimony that the plaintiff could not teach karate and needed to have someone with him at all times due to his hearing loss. (Tr. 19).

The medical evidence showed that, during the period leading up to the plaintiff's onset of disability on September 30, 2014, and in the time period immediately to follow, the plaintiff

suffered from recurring gout, but that his symptoms were improved through medication and lifestyle changes. (Tr. 272, 279, 284, 288, 3325, 3341). Similarly, the plaintiff's records show that he had pancreatitis and epigastric pain, but that this condition also improved through lifestyle changes including the cessation of alcohol.[9] (Tr. 3316, 3319, 3559).

The medical records also provide insight into the plaintiff's functional capacity. Physical therapy records show that the plaintiff was able to do planks, and that, as of December 2015, he was able to swim and perform karate movements, including punching and weapon wielding, although with pain. (Tr. 383, 385). In March and April 2016, the plaintiff's physical therapy records reflect that he was able to perform in karate competitions, his shoulder was getting better, and he was seeing improvement in his punching and weapons movements. (Tr. 442, 2545-2548). Further, records from 2017 reveal that the plaintiff was working out an average of two-and-a-half hours per day, six days per week, and was training vigorously. (Tr. 552, 491). Although these records are from a time after the plaintiff DLI, when considered with the lack of severe impairment shown in the records from 2011 to 2014, the Court finds that there were no obvious gaps in the plaintiff's medical history.

The Court's finding that there were no obvious gaps in the medical history is not impacted by the fact that the ALJ found both State agency physician assessments to be unpersuasive. *See Kelly W. v. Kijakazi*, No. 20-CV-948 (JCH), 2021 WL 4237190, at *16 (D. Conn. Sept. 17, 2021) ("[The ALJ] is entitled to weigh all of the evidence available in make and RFC finding . . . consistent with the record as a whole") (quotation marks and citation omitted). Moreover, these

---

[9] The Court notes the discrepancy between the plaintiff's hearing testimony and the evidence in the medical record. At the hearing, the plaintiff stated that he had not had a "hard drop of liquor" in over thirty years when asked about his alcohol use. (Tr. 50). Meanwhile the plaintiff's medical records reflect that he admitted to consuming alcohol and that the plaintiff's epigastric symptoms improved with the cessation of alcohol. (Tr. 3316, 3319). The Court does not purport to know the reasons for the plaintiff's potentially misleading testimony at the administrative hearing but acknowledges that this discrepancy could be part of the ALJ's reasonable basis to discredit the plaintiff's hearing testimony.

two assessments both found the plaintiff did not provide sufficient evidence to support a claim of disability. In other words, the only reason that these assessments did not provide opinions on the plaintiff's RFC was that both physicians concluded, as a threshold matter, that the plaintiff had no medically determinable impairments. As such, the fact that the ALJ found them unpersuasive and concluded that the plaintiff did have medically determinable impairments did not in and of itself create an obvious gap in the record.

Further, the plaintiff's medical history contained evidence as to the plaintiff's functional capacity upon which the ALJ could determine the plaintiff's RFC. This differentiates this case from others, such as *Ronald B.*, in which the court remanded the case back to the agency on the basis that in the absence of medical opinion evidence, the ALJ lacked necessary assessments of the plaintiff's functional capacity. 2022 WL 1210741, at *5. In *Ronald B.*, the ALJ did not have the benefit of State agency physician assessments as the consultants had "insufficient evidence to make a determination about [plaintiff's RFC] during the period at issue[.]" *Ronald B.*, 2022 WL 1210741, at *5. Additionally, none of the plaintiff's providers provided a functional assessment. *Id.* However, in *Ronald B.*, the record was found to be devoid of any assessment or evidence of the plaintiff's limitations or functioning capacity, and thus there was an obvious gap in the record. *Id.* Here, the medical record contains ample evidence of the plaintiff's functional capacity. And not only is there a general lack of evidence of severe impairment at the time of the DLI, but there is affirmative evidence in the record upon which the ALJ relied as to the plaintiff's capacity for activity.

Given the volume of medical evidence in the record, including evidence of the plaintiff's functional capacity, the Court finds that the plaintiff's medical history contained no obvious gaps and was sufficiently complete to allow the ALJ to make a determination as to the plaintiff's RFC

without soliciting additional medical opinion evidence, and therefore remand is not appropriate on this basis. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x. 29, 34 (2d Cir. 2013) (finding that remand was not required on the basis of the ALJ's failure to request medical opinion evidence where the record was extensive and provided sufficient evidence as to the plaintiff's limitations); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x. 82, 84 (2d Cir. 2015) (finding that remand was not required where the ALJ had the benefit of a complete medical history, including treatment notes which spoke to the plaintiff's functional capacity).

### B.    The ALJ's RFC Determination

The plaintiff claims that the ALJ failed to incorporate several exertional and non-exertional factors into the plaintiff's RFC, and that as such, the RFC is unsupported. (Doc. No. 18-1 at 11-12). Specifically, the plaintiff argues that the ALJ erred in finding that he could meet the physical demands of medium exertion work and failed to accurately consider his hearing loss. (*Id.* at 12-14, 19-20). The plaintiff also argues that the ALJ's RFC determination was unsupported as the ALJ minimized the plaintiff's credibility, and there was ample objective medical evidence of the plaintiff's multiple pain conditions. (*Id.* at 15-16). The Commissioner asserts in rebuttal that the ALJ's determination was supported by substantial evidence and that there lacked evidence in the record showing that the plaintiff had greater exertion limitations, even accounting for the plaintiff's hearing loss. (Doc. No. 20-1 at 7-9, 11-13).

As previously stated, the ALJ is "entitled to weigh all of the evidence available to make an RFC finding . . . consistent with the record as a whole." *Kelly W.*, 2021 WL 4237190, at *16. Indeed, "this [C]ourt may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner." *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-1662 (AVC), 2021 WL 6805715, at *6 n 12 (D. Conn. Nov. 16, 2021). As such, at this stage of the sequential evaluation, the plaintiff, not

the Commissioner, carries the burden to prove a more restrictive RFC. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) .

Contrary to the plaintiff's argument, the ALJ's determination that the plaintiff could perform a reduced range of medium work was supported by substantial evidence in the record. In reaching his RFC determination, the ALJ considered the plaintiff's testimony regarding his back pain, the plaintiff's involvement in the motor vehicle accident, as well as the x-ray taken of the plaintiff's cervical spine, limiting the plaintiff to only having been able to engage in occasional bending, twisting, balancing twisting, squatting, kneeling, and crawling. (Tr. 19, 20). Similarly, the ALJ considered the plaintiff's shoulder pain, arthralgias, and back pain in limiting the plaintiff to having only been able to engage in occasional climbing and finding that he could not have climbed ropes, scaffolds, or ladders. (Tr. 19, 21). The ALJ further accounted for the plaintiff's shoulder pain and arthralgias in determining that the plaintiff could have engaged in only occasional overhead reaching with the left master arm. (*Id.*). The ALJ additionally accounted for the plaintiff's gout, referencing medical evidence establishing the plaintiff suffered from sporadic gout pain, and limited the RFC to find that the plaintiff should not have been required to operate left or left foot controls. (Tr. 19-21).

The Court is similarly unpersuaded by the plaintiff's argument that the ALJ failed to accurately consider the plaintiff's hearing loss. The ALJ had the benefit of the plaintiff's testimony stating that, at the time of the alleged onset of disability on September 30, 2014, he needed someone with him at all times to help him understand others. (Tr. 52). The ALJ also considered the fact that the plaintiff wore hearing aids but also noted a statement by the plaintiff in the record that he learned best by hearing. (Tr. 21-22). Ample consideration of the plaintiff's hearing limitations is reflected in the ALJ's determination that the plaintiff must work in an environment

free from very loud noise, so that the plaintiff would be more likely to be able to hear others with the assistance of his hearing aids. (Tr. 19).

The ALJ also appropriately considered the plaintiff's participation in karate and other physical activity in formulating the plaintiff's RFC. Again, the ALJ is entitled to consider and weigh all evidence available in the record. Although the plaintiff is correct that the plaintiff testified that he needed black belt students to demonstrate the moves in his karate classes, the ALJ also appropriately considered other evidence in the record showing that the plaintiff himself engaged in karate competitions as well as training and exercise. (Tr. 21).

Additionally, counter to the plaintiff's argument, the ALJ also considered the plaintiff's arthritis in formulating the RFC, noting the March 2011 visit where the plaintiff complained of thumb pain and was diagnosed with arthritis. (Tr. 20).

In objecting to the ALJ's RFC, the plaintiff fails to demonstrate that the ALJ did not sufficiently address the plaintiff's non-exertional requirements in tailoring the RFC and further fails to provide countervailing evidence establishing that greater RFC limitations than those set forth by the ALJ are required. The ALJ was tasked with assessing whether the plaintiff was disabled on September 30, 2014. As evidence of the plaintiff's disability at this time, the plaintiff points to the treatment notes and an x-ray from 2011 regarding arthritis in the plaintiff's right hand, the plaintiff's 2012 motor vehicle accident and the related x-ray of his spine, and the records of his treatment for gout. (Doc. No. 18-1 at 12-13). This evidence was properly considered by the ALJ in assessing the plaintiff's RFC. As additional evidence of disability, the plaintiff then discusses how his treatment for gout was complicated by his liver disease. (*Id.* at 14-15). However, there is no support in the record that the plaintiff's liver condition existed on September 30, 2014. Further, the plaintiff relies on his testimony as to his physical limitations at the time of the hearing in

October 2021, including his back pain and treatment by a chiropractor and his treatment for liver disease. Again, because the relevant period of disability is limited to September 30, 2014, the plaintiff must show that any conditions contributing to a finding of disability existed at that time. In relying on evidence of conditions that arose at some point after September 30, 2014, without support that these conditions existed on September 30, 2014, the plaintiff appears to argue in the supporting memorandum of law that the relevant period started with the alleged onset date and then extended beyond the DLI of September 30, 2024. This is simply inaccurate.

Based on the foregoing, the Court finds that the ALJ's RFC determination was supported by substantial evidence. *See Snyder v. Comm'r of Soc. Sec.*, No. 22-CV-277, 2023 WL 1943108, at *3 (2d Cir. 2023); *see also Smith*, 740 F. App'x at 726.

### C.    Plaintiff's Disability Under Grid Rule 202.06.

The plaintiff further asserts that, had he been appropriately classified in the light exertional level, he would be considered disabled under Grid Rule 202.06. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.06. (*Id.* at 19). Grid Rule 202.06 reflects that a claimant limited to light exertional work, who is of advanced age, who has at least a high school degree, and who is skilled or semiskilled, but who's skills are not transferable, would be considered disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.06. Even had the plaintiff been assessed as being limited to light exertional work, the ALJ found that the plaintiff had no previous work experience and therefore this grid rule, which covers claimants who are skilled or semi-skilled but whose skills are not transferable, would not apply to the plaintiff. (Tr. 23).

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Court respectfully recommends that the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18) be **DENIED**, and the Commissioner's Motion to Affirm the Decision of the Commissioner (Doc. No. 20) be **GRANTED**.

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (*per curiam*).

It is so ordered this 23rd day of February 2024, at New Haven, Connecticut.

 /s/ Robert M. Spector, U.S.M.J.
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE